And we will now go to the last case to be argued this morning that has not been submitted on the briefs already, and that's Duffy v. Oregon Youth Authority. Good morning. My name is William Goode. I'm going to reserve four minutes for my rebuttal and a cross-appeal. While my client, Brenda Duffy, prevailed at trial, her case was essentially gutted at summary judgment on the premise, an incorrect premise, that there was no employee-employer relationship between her and the Oregon Youth Authority. Under the Rehabilitation Act, there is nothing for a claim of retaliation under the Rehabilitation Act. There is nothing that requires there to be an employee-employer relationship. Otherwise, at summary judgment, she put on evidence that satisfied each of the elements of the Rehabilitation Act. She was speaking out on behalf of some of her students who were disabled. She suffered retaliation, and specifically from the Oregon Youth Authority. For example, well, they began to isolate her. She was excluded from the communication. You say there doesn't have to be an employee-employer relationship to bottom a claim of retaliation, but there has to be causation, does there not? Yes, there does have to be. And so, therefore, the retaliation has to be caused by the person to whom you're pointing a finger. That is the OYA. Now, if the OYA is not an employer of Duffy, then Duffy is complaining that her employment has been changed in retaliation for the expression of her views. How is there causation between OYA and the result of which Duffy objects? Well, in this instance, what must be kept in mind is that the Oregon Youth Authority controlled the workplace. There were just two ESD employees at Camp Florence, which was the school. In effect, Mr. McClellan was the director of the school, so he would be the equivalent of the principal of the school. And it's the Oregon Youth Authority that controlled the entire workplace. Part of what was the retaliation was that there was a hostile environment. She was isolated by the other workers, and most of the other workers were Oregon Youth Authority workers, basically the corrections officers. And your claim is that OYA caused the persistent hostile environment for Duffy by usurping the normal supervisory role of the employer over the employee. No, they didn't usurp it. They were, in effect, well, it's like bringing in someone from a temp service, a contract worker, and they're working in an employment place. Essentially, the ESD was providing the two teachers, but it was the Oregon Youth Authority which ran the workplace. It's not like a temp. A temp takes directions about the details of the temp's work, et cetera. There's no indication here that Oregon Youth Authority was directing her on how to teach, I don't believe. Well, there is evidence that they were directing how to teach in this fashion. Number one, they granted the diplomas, so it was them who determined what qualified as credit to they were the ones who controlled whether or not these convicts, these students, came into the classroom or if they were allowed to go directly out on their work release in the community. So they essentially controlled the schedule day to day. Her supervisors from the ESD, 60 miles away in Corvallis, did not control her day to day work activities. It was the Oregon Youth Authority that controlled those activities. So they were in control of the conditions of her workplace. When she spoke out about credit not being appropriately given to students and IEPs not being followed, she was speaking out against the Oregon Youth Authority allowing the students to deviate from the IEPs, the Individualized Education Programs, that one-fourth to one-third of the convicts at the Camp Florence had. So those were the issues. But the court granted summary judgment for the Oregon Youth Authority on the premise that there was no employee-employer relationship, but the Rehabilitation Act doesn't require that. And so far as a causal relationship, after the ESD did their so-called investigation in September of 2002, Ms. Duffy was ready to return to work in October. It was the Oregon Youth Authority that continued her administrative leave. I recall what it was construing in her behavior, her suspension, until January for another three months. Everything was already decided and viewed and weighed upon by the end of September when she had two meetings during September with all the authorities there. So they continued her suspension. Then when she comes back in January and she sits down with the Director of Human Relations of the ESD and Scott Perry, they give her this letter that's labeled a letter of reprimand. In that letter of reprimand, they also say that, well, when you return, of course, if you're here, Scott McClellan, the Director of the Oregon Youth Authority, is going to have still closer supervision of you over such things as tardiness. Four minutes. Thank you. May it please the Court, I'm Peter Mercereau on behalf of the Cross Appellant and Appellee, and I would like to, with the Court's indulgence, reserve two minutes for rebuttal on the cross appeal. Your Honor, I was surprised to hear counsel indicate he felt the case had been gutted on summary judgment. In fact, the balance of all of the grounds we raised for summary judgment were denied, and we then went to trial on what, frankly, we viewed the principal claim, which was the 1983 and Rehab Act claims against the ESD. The trial resulted in defense verdicts on the 1983 claims against the ESD and on the state whistleblowing claims and on an plaintiff's verdict on the Rehab Act claim against the ESD. If I could, I'd like to briefly address the issues on the appeal from the motion, or the rulings on the motion for summary judgment, and then move to what we think is the heart of our cross appeal, which is the appropriate application of Garcetti v. Sabalas to this fact pattern. Your Honor, Magistrate Coffin, in his findings and recommendation at the summary judgment stage, found, and I'm quoting from page 7 of the FNR, that plaintiff has made no showing that OYA or McClellan intimidated, threatened, coerced, or discriminated against the plaintiff, and similarly, plaintiff has failed to demonstrate that OYA or McClellan took an adverse employment action against her. Now, I don't believe there is a case in this circuit that has expressly held that a retaliation claim under the Rehab Act requires a so-called adverse employment action. But in logic and in law, using the Title VII jurisprudence and the 1983 jurisprudence, we suggest that some form of action in the workplace must be taken that has financial consequences or some direct harm or injury to a plaintiff that could be considered an equivalent of an adverse employment action if there is not the employment relationship. The problem, as I look at this, and maybe you can tell me if I'm wrong, I couldn't find anything that McClellan actually did. I recognize that he told her that her relationship with her, her interaction with the wards was not too bright because somebody would like you to go off at her, since they're not very controllable. Is there anything, is there any evidence that you know of of what he actually did to her? No, none. And in fact, Your Honors will recall the one incident that is repeated throughout this brief, Mr. Good's brief, is this interchange that occurred in a classroom one day where a student used inappropriate sexual language in the presence of Jim Ramirez and Brenda Duffy, the two ESD teachers. I won't quote the language, but it's in the briefs. And Mr. Ramirez said to the student, that is inappropriate language in the presence of a lady. Brenda Duffy's response was, it's inappropriate, period, and I consider that to be offensive because I'm the lady and I want you to do something to that student. McClellan testified that he was not going to get involved with the response of the teachers to that incident because it was not his role to do so. He would get involved with student discipline and all of that's in the record. But Your Honor, to answer your question, there is no evidence in this record, nor was there at trial. I think we should actually focus on the summary judgment record, that McClellan did anything to Brenda Duffy that impacted her working entitlements or conditions. And if I could move also on the summary judgment phase to the constructive discharge issue here. The Court is well familiar certainly with the standards that apply to constructive discharge and we suggest to you that on this record, this was not a pervasively hostile work environment by the time Brenda Duffy submitted her resignation in April of 2003. The time continuum here begins in the spring of 2002 when performance issues surfaced and were dealt with in a series of communications between her supervisors at the ESD and Brenda Duffy, continued through the summer of 2002, continued through the administrative leave that occurred in September, which was paid, and ended in January of 2003 when she was requested to return to work with modifications to her work schedule. She was not at the camp from September to April when she resigned. To suggest that the conditions that she was asked to return to were so hostile that a Your Honor, we suggest from a four corners approach, the evidence adduced on the issue of what the performance problems were suggests that the ESD was trying to work through a series of perceived problems with Ms. Duffy's performance, namely her, as we've described in our brief, her rigid approach to the instructional curriculum, her problems in dealing with her at Salem, and her defensive posture and stance that she developed when she was told by her supervisors that these problems existed and she had to deal with it. We would be more than willing to submit the IIED ruling on the papers. And now if I could shift to the cross appeals, Your Honor, cross appeal. I'd like to hear your views on Garcetti and how it applies in this case. Yes. Garcetti, of course, was decided in 2006, well after our motion for a directed verdict was made at the time of this trial in 2005. We are fully aware of the fact that Garcetti was a 1983 First Amendment speech retaliation case. Brenda Duffy was a teacher in a public school district. We note she was not a special education teacher. She was a regular classroom teacher who happened to have amongst her student body students with IEPs, but she was not a special ed teacher. Garcetti stands for the proposition that speech related to the performance of the speaker's job is not necessarily protected by the First Amendment. And we believe that while there's no guiding precedent yet in a rehab retaliation case, that the same principle should apply to a teacher in the IDEA or special education context whose speech and focus relates exclusively to the performance of her job and does not relate to a claim of illegality or unlawful conduct relating to the special education program. Except the Supreme Court expressly said one reason we're not saying there's First Amendment protection is that you've got plenty of civil laws and criminal laws that are designed to protect employees and protect checks on supervisors who would order inappropriate actions. And that's precisely what she said was going on here. And that's what the Civil Rights Act laws are about. That's what Title VII is about. That's what Title VI is about. I mean, that's what all the titles are about, including the Rehabilitation Act. So Garcetti doesn't see any advance of the ball at all for your, for this case. If I could wave, could I just forget the rebuttal? I'd like to respond to this. I'll just wave that because I think this goes to the heart of this case. What I would ask the court to do is, what exact whistleblowing occurred by Brenda Duffy here in this case that would trigger protection under the Rehab Act? In the Settlegood case, which is one of the seminal cases dealing with the retaliation claim under the Rehab Act, the plaintiff in that case wrote a ten-page letter in which she complained that the entire special education program at the Portland Public Schools was unlawfully applied, lacked equity, lacked parity, and was systemically problematic and unlawful. In this case, there is no evidence that Brenda Duffy, apart from her speech about her complaints regarding the way she was treated in the workplace, the way she was differentiated from Mr. Ramirez, who took a different instructional approach, there's no special ed whistleblowing here by her. She complains that a given IEP was not being complied with, but this is exactly what a teacher who is a member of the IEP team is expected to do in staff meetings and with her supervisor. If we've come to the point where every time a staff member at a meeting says, I think this IEP was misapplied, if that's whistleblowing, as opposed to saying, I believe this district is not applying the laws correctly, I believe this district is a matter of philosophy, does not care about disabled children, some speech like that that would trigger the kind of protection either in the First Amendment or these statutes, we believe, has to be in play. I'm out of time, Your Honor. Thank you. Judge Fernandez, you were correct about Garcetti and what it said, but it also went on to say that it explicitly did not apply to the education setting. When Garcetti asked for cert in 2005, January 2005 during that session, the settlement case in Portland Public Schools also asked for cert, and cert was not granted on the settlement case, but it was granted on Garcetti. Counsel, sir, does that mean that every time, as counsel has suggested, a teacher is unhappy with the way the principal treats him or her, they're whistleblowing? No. So we've got a whistleblower case every time a teacher, for instance, is unhappy with the way that they got a classroom assignment, then they don't like the classroom I'm in, so they get whistleblower protection? Setting aside the Rehabilitation Act for a moment, the whistleblowing in this instance was for two facets principally. One was is there was internet access that was in violation of the Oregon Youth Authority's own rules. There was supposed to be supervision, and these convicts, some of them sex offenders, were accessing pornographic websites and hitler.com hate sites. That was one thing. They were violating that rule. The other thing is that it was the Oregon Youth Authority which was giving out the diplomas, and what Ms. Duffy was complaining about is they were granting diplomas to some of these students who were on IEPs without the work being done, without proper credit. She was the teacher in the academic setting. It's odd that she would be labeled not a special education teacher. There were only two teachers there, she and Mr. Ramirez. He was out in the bike shop, and she was in the academic setting. She was the teacher providing the academic instruction for all of these 24 to 25 students, one-third of whom were on IEPs. As far as the constructive discharge, she did not get any economic damage from that exercise. That was cut out at summary judgment, because the court found that that didn't rise to the appropriate level. Basically, what she was told was, nothing is going to change here as far as the things that you've been complaining about. You're being isolated in the program and everything else, but instead, we're also going to make it such that Mr. McClellan will take a more active role in your supervision. We're going to keep an even closer eye on you when you come back. What has to be looked at in terms of whether or not this was an unsafe workplace for her, is that these students, these people who were young felons, were in their last six months of incarceration. It wasn't like we had a continuing population there that was the same people all the time. They were leaving. The continuity of the unsafeness for her was the staff. Students would turn over. What made the unsafe workplace was that they were cutting her out of the communications loop. They were, in effect, making the workplace a security risk for her. The only thing that she's told when she complains about not being included in the loop, being isolated in a different place, being removed from the program that she was supposed to be providing the academic instruction, was that she's going to get more of that. As far as an example of the specific conduct of Mr. McClellan, there was a situation where there's two sets of rules. When Mr. Ramirez waves a dollar in front of some students and uses this as basically bidding, who's going to win this dollar, even though he was an instructor, Mr. McClellan counseled the student, but he also counseled the teacher for that inappropriate behavior. When Brenda Duffy complains, he should have said something when the student said, move your twat, lose your spot, the director, Mr. McClellan, does nothing. He does not enforce the rule about how the students are supposed to behave in the classroom and respect the rules. That's one of the differences between Mr. McClellan of how he treated Ramirez, an ESD teacher, and Ms. Duffy. You're over your time, counsel. Thank you. I want to congratulate both counsel for a very interesting presentation. The case of Duffy v. Oregon Youth Authority is submitted, and this court will stand in recess until tomorrow morning at 9 o'clock.
judges: Fernandez, Bea, Ezra